## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**7-ELEVEN, INC.,** a Texas
corporation,

      Plaintiff,

                                Case No.: 6:13-cv- ~~6:13cv953-Orl~~ -18GJK

vs.

**KAPOOR BROTHERS INC.,**
a Florida corporation, **PURSHARTH
KAPOOR**, an individual,

      Defendants.

_____/

## COMPLAINT

      Plaintiff, 7-Eleven, Inc. ("**7-Eleven**"), sues Defendants, Kapoor Brothers, Inc. (the

"**Corporate Franchisee**") and Pursharth Kapoor (the "**Guarantor**" or "**Individual Franchisee**"

and, collectively, the Corporate Franchisee and the Guarantor/Individual Franchisee are referred

to as either the "**Defendants**" or the "**Franchisees**"), and alleges:

## NATURE OF THIS ACTION

      1.      This is an action for injunctive relief and damages based on the Defendants'

infringement of 7-Eleven's trademarks and service marks after termination of their franchise

agreements with 7-Eleven.  This action is also for damages, declaratory relief, injunctive relief,

and to recover possession of personal and real property located in Brevard County, Florida.

Finally, this action also seeks to recover damages on a promissory note and a guaranty.

## JURISDICTION AND VENUE

      2.      Jurisdiction in this Court is founded upon 28 U.S.C. §§ 1331, 1338 and 15 U.S.C.

§ 1121, because the civil action hereinafter alleged arises under the trademark laws of the United

States.  This Court also has supplemental jurisdiction over the state law claims contained in Counts Three through Nine pursuant to 28 U.S.C. § 1367.

3.      Jurisdiction in this Court is also founded upon 28 U.S.C. § 1332.  The parties to this action are completely diverse and the amount in controversy is more than $75,000.

4.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1), (b)(2) and (c).

## PARTIES

5.      7-Eleven is a Texas corporation with its principal place of business in Dallas, Texas, and is duly authorized to do business within the State of Florida.  It is a citizen of the State of Texas.

6.      The Corporate Franchisee is a Florida corporation.  The Franchisee's principal place of business is 400 W Merritt Island Causeway, Merritt Island, Florida 32952-4810, in Brevard County, Florida.

7.      The Individual Franchisee is an individual who currently resides in, is a domiciliary of, and is a citizen of Brevard County, Florida.  The Individual Franchisee owns all the outstanding shares of the Corporate Franchisee, serves as President of the Corporate Franchisee, serves as the only director of the Corporate Franchisee, and actively operates the Corporate Franchisee.

## BACKGROUND

8.      7-Eleven is the premier name and largest chain in the convenience retailing industry.

9.      In the 48 contiguous states, 7-Eleven is divided into various Zones, each of which has discrete territories designated by 7-Eleven as markets.  The stores in the Merritt Island area are located in what is known as Market 1507.

10.     Through its franchise system, 7-Eleven promotes and provides products and services to its customers throughout the United States.  In order to identify and differentiate its stores, products and services, 7-Eleven allows its franchisees to utilize the 7-Eleven trademarks and trade names in connection with the operation, advertising and identification of the convenience store.

11.     As part of the franchise agreement, 7-Eleven requires, and the franchise agreement for each store provides for, accounting systems and controls that are designed to provide accountability for the operation of the store, as well as to determine and account for the "equity" position of the franchisee, *i.e.*, the franchisee's net worth in the store's operations, which, as hereinafter alleged, the franchisee is obligated to maintain above a certain minimum level.

12.     In the case of a traditional franchised 7-Eleven store, such as those franchised by the Defendants, 7-Eleven selects the location of each store, purchases the land and constructs the store, or leases an appropriate structure, and prepares the store for operation, including providing all equipment (shelves, counters, cash registers, lighting and other fixtures, heating and cooling equipment, signs, parking lot preparation, etc.) necessary for its operation.  In essence, 7-Eleven presents a franchisee with a complete "turn-key" physical plant ready for retail operation.

13.     In the case of a traditional franchised 7-Eleven store, under the current, and prior forms of, the franchise agreement, a franchisee is leased the store and equipment, and is licensed to use the 7-Eleven® Service Mark, related trademarks, trade dress and system of operations. The 7-Eleven® Service Mark is the subject of multiple United States Trademark Registrations, including Registration Nos. 896,654 and 920,896, registered August 11, 1970 and September 21,

1971, respectively. 7-Eleven also owns United States Trademark Registrations for certain other related trademarks (collectively, the "**Trademarks**").

14. In such arrangement, a franchisee does not acquire ownership of the store, its premises or any of the physical plant, all of which remain the property of 7-Eleven. Rather, the franchisee's primary ongoing financial interest is in the net income derived from the store's operations, which the franchisee draws against on a weekly basis.

15. In the case of a traditional franchised 7-Eleven store, such as the stores franchised to Defendants, 7-Eleven's essential financial interest is in receiving a percentage of the "gross profit" (net sales less cost of goods sold) derived from operation of the store, which percentage (usually between 50 and 52 percent) is designated in the franchise agreement as the "7-Eleven Charge." In a traditional franchised 7-Eleven store, the net income, in which the franchisee has an interest, is the amount remaining after deducting both "operating expenses" (such as payroll and similar expenses) and the 7-Eleven Charge from the gross profit. In such an arrangement, operating expenses do not include certain store repairs, replacement of equipment, insurance, real property taxes, any rental charge, electricity, heat or other utility costs, all of which are borne by 7-Eleven.

**Financing Offered by 7-Eleven
to the Franchisee: The Open Account**

16. In addition to furnishing the store and equipment to the franchisee, 7-Eleven provides bookkeeping services for the store. If a franchisee requests, 7-Eleven will also provide financing for the operation of the store, pursuant to the terms of the franchise agreement. Although most franchisees, like the Franchisees, utilize 7-Eleven's financing, they are free to obtain their own financing for the operation of their stores.

17.     In order to secure the financing that 7-Eleven provides to the franchisee, 7-Eleven is given a security interest in, among other things, all of the present and thereafter acquired store inventory, and the proceeds thereof.  Each 7-Eleven franchisee executes a security agreement (the "**Security Agreement**") as a part of and supplementing the franchise agreement.

18.     The franchisee is responsible for purchasing the initial inventory for the store and for all subsequent inventory purchases.  However, the franchisee may make its initial inventory purchase by paying only part of the purchase price and using 7-Eleven's financing to pay the balance.  The amount financed by 7-Eleven and the balance due from the franchisee is maintained in an account defined in the franchise agreement as the "Open Account."  The Open Account reflects any initial inventory financed, and all subsequent purchases and expenses (that are financed by the franchisee through 7-Eleven), as well as revenues which flow through the Open Account.  Essentially, the Open Account is a running working capital account that at any particular point in time reflects the outstanding balance of any unpaid sums that 7-Eleven has loaned or advanced to the franchisee to operate the store.

**Franchisee's Reporting Obligations
at the Heart of the 7-Eleven System**

19.     After operation of a store commences, the franchisee is obligated to record accurately all monetary and financial transactions.  First, the franchisee is obligated to ring up all sales made in the store, using, to the extent possible, the point-of-sale (POS) scanner, including all sales of merchandise, money orders, cigarettes, lottery tickets, and other sales.  The cash register automatically maintains a running total for all entries.  The franchisee uses the information collected from the POS cash register totals for the day to prepare the daily reports the franchisee is required to make to 7-Eleven.

20.     The franchise agreement also obligates the franchisee to report all activity of the store in a manner and at times specified by 7-Eleven.

a.      **The Daily Cash Report and Daily Deposits of Receipts**

21.     With respect to sales and receipts of the store, franchisees are obligated to submit a daily cash report ("**Daily Cash Report**") each day and make daily deposits of receipts into a designated 7-Eleven bank account.  The franchisee is required by the franchise agreement to deposit each day's cash receipts into the designated bank account no later than the following day.

22.     The Daily Cash Report indicates the amount of sales for the day as recorded or rung up on the cash register, sales made by credit card, and sales of money orders.  The Daily Cash Report also accounts for and records any deductions to or from cash that affects the daily deposit, such as manufacturers' coupons.  For example, a franchisee could record a deduction for cash received from sales that was used to pay a vendor for inventory for the store or for unanticipated or one-time labor costs that are not paid directly through 7-Eleven's payroll system.  Although the franchisee is responsible for the labor and payroll costs in the operation of the store, the franchisee's employees are paid through what is effectively a "payroll service" that 7-Eleven provides to its franchisees, as part of the overall accounting services provided by 7-Eleven as contemplated by the franchise agreement.

23.     7-Eleven credits the franchisee's Open Account for the cash deposit and thereby reduces any amount owed on the Open Account.  The Daily Cash Report is prepared and electronically submitted to 7-Eleven by the franchisee (or, if desired by the franchisee, by the franchisee's designated employee) and is the only means used to report daily sales and account for all receipts.  It is at the heart of 7-Eleven's accounting system.  When 7-Eleven's accounting

department receives the Daily Cash Report, information in it is entered into 7-Eleven's computerized accounting records.

        **b.**     **<u>Inventory Purchases</u>**

24.     The franchisee does not need to use the cash receipts in the store to pay for inventory or other supplies.  In fact, 7-Eleven discourages this practice.

25.     When a franchisee purchases merchandise and supplies, the franchisee is required, pursuant to the franchise agreement, to report and submit the related invoice, bill or statement to 7-Eleven for recording and for direct payment to the vendor by 7-Eleven.

26.     When 7-Eleven pays an invoice submitted by a franchisee for an inventory purchase for the store, the payment is charged to the franchisee through the Open Account.  The balance owed by the franchisee on the Open Account is increased by the amount of the expenditure. 7-Eleven pays the related invoice, bill or statement only so long as it is willing to provide Open Account financing to the franchisee.

27.     Very few franchisees use monies in the store to pay for inventory.  Instead, franchisees typically submit invoices for inventory purchases or, more commonly, the inventory vendors electronically submit invoices for purchases to be paid directly by 7-Eleven since this minimizes the paperwork required of the franchisee and aids the accurate and orderly accounting for the store.

28.     Alternatively, as noted above, when the franchisee pays for inventory directly to the vendor with cash from the store's receipts, the invoice, bill or statement must be submitted to 7-Eleven for verification and recording.  If the franchisee pays for the inventory in cash, it is required to be reflected on the Daily Cash Report (to account for the reduced amount of the deposit

made to the store's bank account) and the related invoice, bill or statement is required to be turned in to 7-Eleven.

29.     Commencing in 2004, 7-Eleven provided in its new franchise agreements that most inventory purchases would be made by the franchisee through one of the selected preferred vendors identified by 7-Eleven.

30.     In addition, most purchases through these vendors are invoiced electronically between the vendor and 7-Eleven.  Through the electronic invoicing, the payments and charges are made directly by 7-Eleven for the franchisee and posted against the franchisee's Open Account, thereby reducing and simplifying the inventory accounting for both the franchisee and 7-Eleven.

       c.      **Inventory Recording and Accounting**

31.     7-Eleven operates what is known as a retail method of inventory accounting system. When a 7-Eleven store commences operations, a physical count of all inventory is made and the inventory is valued "at retail," *i.e.*, at the retail selling price of each item of inventory.  The retail selling prices are determined by the franchisee, who is required to report them to 7-Eleven for accounting purposes.  7-Eleven must rely upon the franchisee's honesty in reporting to 7-Eleven the retail selling prices.  This opening inventory is the initial balance in the retail book inventory maintained in the store's accounting records by 7-Eleven.

32.     When a franchisee purchases merchandise for the store, the invoice is transmitted to 7-Eleven together with the value of the purchased merchandise at retail.  7-Eleven then increases retail book inventory by the retail value of the merchandise purchased.  Reported sales of merchandise to customers reduce the retail book inventory.  Sales of merchandise to customers that are not recorded do not reduce the retail book inventory, although the actual retail inventory is, in fact, reduced.

33.     The 7-Eleven franchise system makes it absolutely mandatory that franchisees report all store activity in a timely and accurate fashion.  7-Eleven uses and relies on the reported information in a variety of ways, including:

   a. The honest reporting of sales and inventory purchases allows 7-Eleven to calculate the correct gross profit for the store and thus the 7-Eleven Charge; and

   b. The honest reporting of all receipts of the store, including discounts and allowances received from vendors, allows 7-Eleven to credit the Open Account accurately and ensure that funds are not fraudulently diverted out of the store.

34.     In addition to the above, inaccurate or false reporting by franchisees also harms 7-Eleven in several ways:

   a. Intentional understatement of sales deprives 7-Eleven of its full share of the gross profit since the 7-Eleven Charge will be understated;

   b. In addition to fraudulent reporting that results in the direct understatement of a store's gross profit, and thus, has a direct monetary impact on the 7-Eleven Charge, any defalcation of sales proceeds has the same effect as if someone walked into 7-Eleven's office and stole cash from it (i.e., the cash has been misappropriated);

   c. Any fraudulent reporting that results in understated profits means that the equity in the store has been likewise reduced, thus reducing 7-Eleven's security interest in the store.  In other words, 7-Eleven's risk of loss of uncollected debts increases.

   d. When 7-Eleven prepares financial summaries of franchised stores in an attempt to attract new franchisees, understated store sales and profits will make a 7-Eleven franchise look less attractive and thus more difficult to franchise; and

   e. Inasmuch as the fraudulent reporting generally results in an understatement of taxes paid (e.g., sales tax, payroll related taxes, etc.), often times governmental agencies that have been defrauded by the franchisee attempts to collect from 7-Eleven.  7-Eleven must then incur the time and cost to defend itself.

### d.   7-Eleven's Retail Information System (RIS)

35.    7-Eleven utilizes a proprietary Retail Information System (RIS).  The system builds efficiencies into ordering, distribution and merchandising processes and is designed to provide timely, accurate sales information on an item-by-item basis.  RIS includes:

- Touch-screen POS cash registers with scanners;

- Integration of credit-card authorization into the POS register;

- Item-level information to assist in making product-ordering decisions;

- Automation of some daily reporting requirements, such as merchandise sales; and

- A payroll time-keeping mechanism.

36.    Each 7-Eleven store usually has two or three cash registers (also referred to as the POS register system).  The POS register system tracks sales by product and time of day and feeds that data to a server running RIS in the back room or office, which matches the information against inventory on hand and on order.  Store managers know when they are selling what, and can tailor the product mix to their clientele.  The server is shared with 7-Eleven by a dedicated network.

37.    Utilizing the POS register system, merchandise purchased by a customer would be electronically scanned, its price would appear on the register, the cash tendered by the customer would be recorded, a register drawer would open, and the customer would be given the change from his or her purchase, and finally the register drawer would be closed.  If the POS register drawer remains open, another sales transaction cannot be recorded.

38.    The POS register system simultaneously records all transactions in the server -- commonly referred to as an electronic journal -- which, as noted, is accessible by 7-Eleven. 7-Eleven thus has the ability to view on the electronic journal every transaction recorded by store

personnel.  It also has the ability to review certain categories of transactions by simply requesting the program to focus on specified transactions.

39.    In addition to actual sales, the POS register system record when store personnel push certain buttons that can void or circumvent the system, including the PLU inquiry, cancel age verification, and item void buttons.

      **e.**      **Monthly Financial Statements Prepared by 7-Eleven**
                **Based On Information Submitted by the Franchisee**
                <u>**Through the Daily Cash Report and Other Required Reports**</u>

40.    7-Eleven prepares monthly financial statements for each store from 7-Eleven's bookkeeping records.  The information in the bookkeeping records is essentially derived from information supplied by the franchisees, particularly the store's Daily Cash Reports and the employee time sheets submitted and used to process the franchisee's payroll.

41.    The monthly financial statements include a profit and loss statement for the month and an updated balance sheet for the store, as well as comparative information from prior periods and cumulative information for the year to date.

42.    Based primarily on the Daily Cash Reports submitted by the franchisee for the month, the "7-Eleven Charge," is calculated and reflected on the monthly financial statement.  The monthly financial statement also reflects the outstanding balance of the Open Account (the debt owed to 7-Eleven by the franchisee) as of the date of the report.

43.    Each store is required to maintain a minimum "Net Worth," which is essentially defined in the franchise agreement as all of the "assets" (such as the cash register fund, the cost value of the inventory, store supplies, receivables, and prepaids), less the franchisee's payables and secured obligations from the operation of the store (such as accrued salaries and withholding taxes payable), including any Open Account indebtedness to 7-Eleven.

44.    The franchisee may take a weekly draw so long as s/he is not in breach of the franchise agreement and the draw does not cause the net worth of franchisee's assets and liabilities to fall below the Net Worth minimum.

45.    The minimum Net Worth account balance provides 7-Eleven with a financial safety net with respect to each franchised 7-Eleven store.  Inasmuch as 7-Eleven, with regard to a traditional 7-Eleven franchised store, builds or leases the store premises, purchases equipment, delivers a fully operational convenience store to a franchisee from the outset of the franchise relationship, and provides ongoing financing to the franchisee for inventory purchases and other operating expenses, the minimum Net Worth requirement assures that all 7-Eleven franchisees are vested in the operation of their 7-Eleven stores and further serves as a monetary cushion for both the franchisee and 7-Eleven should a franchisee's store experience financial difficulty.

## THE FRANCHISEES

46.    On or about December 16, 2011, the Individual Franchisee entered into a Store Franchise Agreement effective January 16, 2012 (the "**Individual Franchise Agreement**"), pursuant to which, among other things, 7-Eleven leased to the Individual Franchisee certain equipment (the "**Individual Equipment**") and real property presently described as 7-Eleven Store No. 1507-22244A located at 1105 Courtenay Parkway, Merritt Island, FL  32593 (the "**Individual Leased Premises**" or the "**Individual Store**").  A copy of the Individual Franchise Agreement with all exhibits, including the security agreement and the lease, and amendments is attached hereto and incorporated by reference as Exhibit "A" to this Complaint.

47.    On or about June 22, 2012, the Corporate Franchisee entered into a Store Franchise Agreement effective July 10, 2012 (the "**Corporate Franchise Agreement**" and the Individual Franchise Agreement and the Corporate Franchise Agreement are collectively hereinafter referred

to as the "**Franchise Agreements**"), pursuant to which, among other things, 7-Eleven leased to the Corporate Franchisee certain equipment (the "**Corporate Equipment**" and collectively the Individual Equipment and the Corporate Equipment are referred to as the "**Equipment**") and real property presently described as 7-Eleven Store No. 1507-25737A located at 400 W Merritt Island Causeway, Merritt Island, FL  32592 (the "**Corporate Leased Premises**" or the "**Corporate Store**" and collectively the Corporate Leased Premises or the Corporate Store and the Individual Leased Premises and the Individual Store are referred to as the "**Leased Premises**" and the "**Stores**").  A copy of the Corporate Franchise Agreement with all exhibits, including the security agreement and the lease, and amendments is attached hereto and incorporated by reference as Exhibit "B" to this Complaint.

48.     At the time that the Corporate Franchise Agreement was entered, the Individual Franchisee executed the Principals' Guaranty Agreement (the "**Guaranty**").  Under the Guaranty, the Individual Franchisee made a continuing, absolute and unconditional guarantee to 7-Eleven of the full and prompt payment of all indebtedness and liabilities of the Corporate Franchisee as well as full and prompt performance of all obligations, including the obligations regarding the use or discontinued use of the Trademarks.  A copy of the Guaranty is attached hereto and incorporated by reference as Exhibit "C" to this Complant.

49.     In connection with the Corporate Franchise Agreement and the payment of the initial franchise fee, the Franchisees both entered into a promissory note promising to pay 7-Eleven $79,950 plus interest in monthly payments (the "**Note**").  Under the terms of the Note, the Note was immediately due and payable in full upon any breach of the Corporate Franchise Agreement. A copy of the Note is attached hereto and incorporated by reference as Exhibit "D" to this Complaint.

50.     Soon after entry of each of the Franchise Agreements, the Franchisees began operating 7-Eleven branded stores at the Leased Premises.

51.     In or around December 2012, 7-Eleven's Asset Protection group began an investigation concerning the Stores.  The investigation originally commenced because of, among other things, a statistically anomalous number of customer transactions being voided or cancelled utilizing the cancel age verification and other voiding keys on POS register system.

52.     As part of the investigation, 7-Eleven conducted an audit of the Stores, reviewed video of transactions, and conducted surveillance.

53.     For the period of time between November 22, 2012, through February 19, 2013, at the Individual Store, the Individual Franchisee, the Individual Franchisee's brother (who acts as manager of the Individual Store), and other employees of the Individual Store were observed in video-recorded transactions improperly and fraudulently utilizing the cancel age verification and other voiding keys on the POS register system more than fifty times, cancelling sales of merchandise (both of age restricted products, e.g. tobacco, alcohol, or lotto products, and non-age restricted products, e.g. pizza and other food items).

54.     For the period of time between December 29, 2012 and March 9, 2013 at the Corporate Store, the Individual Franchisee was observed in video-recorded transactions improperly and fraudulently utilizing the cancel age verification button on the POS register system approximately forty times.

55.     In addition between December and March 2013, 7-Eleven observed numerous transactions at both Stores where the Individual Franchisee and the Individual Franchisee's brother were inappropriately and fraudulently utilizing the No Sale button on the POS register system.

56.     Pursuant to the Franchise Agreements, 7-Eleven notified the Franchisees that it would conduct an audit in February 2013.  After 7-Eleven notified the Franchisees, 7-Eleven personnel observed deliveries being made to the Stores and inventory delivered for which 7-Eleven never received invoices.

57.     In February 2013, 7-Eleven conducted audits of the Stores.  Those audits revealed inventory out of balance with the expected amounts.  Further, during the audit of the Individual Store, the Individual Franchisee denied the auditors access to a back storage room because, according to the Franchisees, there was no inventory located there.  Subsequently, 7-Eleven was able to access the supposedly-empty back storage room and photographically-documented dozens of cases of non-alcoholic beverages.  By taking such actions, the Individual Franchisee was concealing the true inventory and the extent of the discrepancy that existed.

58.     During the course of 7-Eleven's investigation, it came to learn that Franchisees were violating 7-Eleven's payroll standards and otherwise violating the laws regarding operation of a store as it concerned verification of employment eligibility -- specifically, at each of the stores, at least one regularly-employed person was working without Franchisee having verified employment eligibility or having negligently verified employment eligibility.

59.     On June 20, 2013, 7-Eleven provided the Franchisees notice through personal delivery of two, separate Notices of Material, Incurable Breach (the "**Notices**").  Because the breaches went to the essence of the Franchise Agreements and wholly frustrated the Franchise Agreements, 7-Eleven terminated the Franchise Agreements.

60.     On June 20, 2013, 7-Eleven notified the Franchisees notice that the amounts due under the Note were immediately payable.

61.     After being terminated, the Franchisees refused to:

      a.      immediately surrender the Leased Premises and the Equipment;

      b.      transfer to 7-Eleven or an approved third party transferee the Final Inventory of the Leased Premises;

      c.      immediately cease using the Trademarks and all elements of the 7-Eleven System, including 7-Eleven's Confidential Business Information; and

      d.      cease operating a Competitive Business at the site of the Leased Premises in violation of a covenant-not-to-compete contained in the Franchise Agreement

62.     In addition, the Individual Franchisee failed to pay for or cure the breaches of the Corporate Franchisee, and the Franchisees failed to pay the amounts due under the Note.

63.     All conditions precedent to bringing this suit have occurred, have been satisfied, or have been waived.

## COUNT I -- INFRINGEMENT

64.     7-Eleven realleges and reincorporates by reference paragraphs 1 through 62 above as if fully set forth herein.

65.     The 7-Eleven Trademarks being used by the Franchisees, and those acting in concert with the Franchisees, are identical to 7-Eleven's Trademarks.

66.     The Franchisees, and those acting in concert with them, offer identical goods to the public and move in identical channels of trade as 7-Eleven and its franchisees.

67.     The Franchisees, and those acting in concert with them, use of the Trademarks is without any oral or written consent of 7-Eleven whatsoever.

68.     The use of Trademarks along with any colorable variation thereof by the Franchisees and those acting in concert with them is likely to cause mistake or confusion in the minds of the public in violation of 15 U.S.C. § 1114(1)(a).

69.     Franchisees, and those acting in concert with them, have made profits from their acts of infringement and 7-Eleven has suffered damages.

70.     As a direct and proximate result of the Franchisees', and those acting in concert with him, infringement, 7-Eleven is substantially injured in its business, including harm to the goodwill associated with its marks.

71.     7-Eleven is without an adequate remedy at law because its marks are unique and represent to the public the identity, reputation and goodwill of 7-Eleven and its authorized franchises, such that damages alone cannot adequately compensate for Franchisees' misconduct.

72.     Unless enjoined, the Franchisees and those acting in concert with them will continue to use and infringe upon 7-Eleven's marks.  This threat of future injury to 7-Eleven's business identity, goodwill and reputation requires injunctive relief to prevent Franchisees continued use of 7-Eleven's marks and to ameliorate and mitigate the harm being caused to 7-Eleven.

73.     The infringement charged above is knowing and willful.

74.     The public interest favors an injunction under such circumstances.

**WHEREFORE**, 7-Eleven demands judgment against the Franchisees granting 7-Eleven:

A.     An Order preliminarily and permanently enjoining the Franchisees, their agents, servants and employees, and those people in active concert or participation with them, from:

        1.     Using the 7-Eleven Trademarks or any trademark, service mark, logo or trade name that is confusingly similar thereto;

        2.     Otherwise infringing upon 7-Eleven's marks or using any similar designation, alone or in combination with any other components;

3.      Causing a likelihood of confusion or misunderstanding as to the source or sponsorship of the Franchisees' businesses, goods, or services; and

4.      Causing a likelihood of confusion or misunderstanding as to the Franchisees' affiliation, connection or association with 7-Eleven and its franchisees or any of their goods and services.

B.      An Order, pursuant to 15 U.S.C. § 1118, that all labels, signs, prints, packages, wrappers, receptacles, uniforms, logo items, and advertisements in the possession of the Franchisees, their affiliates, subsidiaries, officers, agents, servants and employees, and those people in active concert or participation bearing 7-Eleven's Trademarks, and all plates, molds, and other means of making the same, if any, be delivered to 7-Eleven at the Franchisees' cost;

C.      An Order requiring the Franchisees to eliminate their advertising under 7-Eleven's Trademarks or any other confusingly similar designations from all media including, but not limited to, websites, newspapers, flyers, coupons, promotions, signs, telephone books, telephone directory assistance listings and mass mailings, all at the Franchisees' cost;

D.      An Order requiring the Franchisees to file with the Court and to serve upon 7-Eleven's counsel within thirty (30) days after entry of any injunction or order, a written report, under oath, setting forth in detail the manner in which he has complied with such injunction or order;

E.      An award of its damages, with pre-judgment and post-judgment interest, as well as all profits made by the Franchisees as a result of their infringement;

F.      An award to 7-Eleven of its attorney's fees and costs pursuant to the Lanham Act; and

G.      Such other and further relief as the Court deems just and appropriate.

## COUNT II -- UNFAIR COMPETITION

75.     7-Eleven realleges and reincorporates by reference paragraphs 1 through 62 above as if fully set forth herein.

76.     The use of Trademarks along with any colorable variation thereof by the Franchisees and those acting in concert with them constitutes a passing off of the goods of the Franchisees, and others acting in concert with them, as those of 7-Eleven and its authorized franchisees, and are likely to cause mistake, confusion and deception of the general public in violation of 15 U.S.C. § 1125(a)(1)(A).

77.     As a direct and proximate result of the Franchisees' infringement, 7-Eleven is substantially injured in its business, including harm to the goodwill associated with its marks.

78.     7-Eleven is without an adequate remedy at law because its marks are unique and represent to the public the identity, reputation and goodwill of 7-Eleven and its authorized franchisees, such that damages alone cannot adequately compensate for the Franchisees' misconduct.

79.     Unless enjoined, the Franchisees and those acting in concert with them will continue to use and infringe upon 7-Eleven's marks.  This threat of future injury to 7-Eleven's business identity, goodwill and reputation requires injunctive relief to prevent Franchisees continued use of 7-Eleven's marks and to ameliorate and mitigate the harm being caused to 7-Eleven.

80.     The public interest favors an injunction under such circumstances.

**WHEREFORE**, 7-Eleven demands judgment against the Franchisees granting 7-Eleven:

A.      An Order preliminarily and permanently enjoining the Franchisees, their agents, servants and employees, and those people in active concert or participation with them, from:

>    1.      Using the 7-Eleven Trademarks or any trademark, service mark, logo or trade name that is confusingly similar thereto;
>
>    2.      Otherwise infringing upon 7-Eleven's marks or using any similar designation, alone or in combination with any other components;
>
>    3.      Causing a likelihood of confusion or misunderstanding as to the source or sponsorship of the Franchisees' businesses, goods, or services; and
>
>    4.      Causing a likelihood of confusion or misunderstanding as to the Franchisees' affiliation, connection or association with 7-Eleven and its franchisees or any of their goods and services.

B.      An Order, pursuant to 15 U.S.C. § 1118, that all labels, signs, prints, packages, wrappers, receptacles, uniforms, logo items, and advertisements in the possession of the Franchisees, his affiliates, subsidiaries, officers, agents, servants and employees, and those people in active concert or participation bearing 7-Eleven's Trademarks, and all plates, molds, and other means of making the same, if any, be delivered to 7-Eleven at the Franchisees' cost;

C.      An Order requiring the Franchisees to eliminate their advertising under 7-Eleven's Trademarks or any other confusingly similar designations from all media including, but not limited to, websites, newspapers, flyers, coupons, promotions, signs,

telephone books, telephone directory assistance listings and mass mailings, all at the Franchisees' cost;

D.      An Order requiring the Franchisees to file with the Court and to serve upon 7-Eleven's counsel within thirty (30) days after entry of any injunction or order, a written report, under oath, setting forth in detail the manner in which he has complied with such injunction or order;

E.      An award of its damages, including pre-judgment and post-judgment interest, as well as all profits made by the Franchisees as a result of their unfair competition;

F.      An award to 7-Eleven of its attorney's fees and costs pursuant to the Lanham Act; and

G.      Such other and further relief as the Court deems just and appropriate.

## COUNT III -- BREACH OF POST-TERMINATION OBLIGATIONS

81.      7-Eleven realleges and reincorporates by reference paragraphs 1 through 57, 59, and 61 above as if fully set forth herein.

82.      The Franchise Agreements contain post-termination obligations upon the Franchisees in Section 28 of the Franchise Agreement.  These obligations include ceasing to use the Trademarks of 7-Eleven.  The Franchise Agreement also requires that the Franchisee comply with the covenant not to compete provision contained in Section 5(d) of the Franchise Agreement.  The covenant not to compete provision prohibits the Franchisee for one year after termination "maintain[ing], operat[ing], engag[ing] in, or hav[ing] any financial or beneficial interest in, advis[ing], assist[ing], mak[ing] loans to, or leas[ing] to, a Competitive Business"

located at the Leased Premises or at the site of any former 7-Eleven store within two years of it being operated as a 7-Eleven store.

83. Franchisees breached the post-termination obligations contained in the Franchise Agreements in, at least, the following material respects:

      a.      Failing to immediately surrender the Lease Premises and the 7-Eleven Equipment;

      b.      Using 7-Eleven's Trademarks in a manner not permitted or consented to by 7-Eleven;

      c.      Failing to cease use of 7-Eleven's confidential information upon termination; and

      d.      by directly or indirectly operating, engaging, and having any financial interest in a Competitive Business at the Leased Premises within one (1) year of termination.

84. Legitimate business interests support the post-termination obligations and, specifically, the covenant not to compete in Section 5(d) of the Franchise Agreements, including protection of 7-Eleven's:

      a.      confidential business information;

      b.      substantial relationships with specific prospective or existing customers;

      c.      goodwill associated with its Trademarks and related insignia and designs in the geographic area formerly served by the Franchisee while a franchisee; and

      d.      specialized training.

85. The restrictive covenants, including the non-compete in Section 5(d), in the Franchise Agreements are not overly broad or overlong and are otherwise reasonably necessary to protect 7-Eleven's legitimate business interests, including, particularly, its confidential business information, its substantial relationships with specific prospective or existing customers

and the goodwill associated with its Trademarks and related insignia and designs in the geographic area formerly served by the Franchisees.

86.     The Franchisees' violation of the restrictive covenants has substantially and irreparably injured 7-Eleven, including without limitation harm to the goodwill associated with its name and marks.

87.     Unless the Franchisees, and those acting in concert with them, are enjoined and the Franchisees are ordered to perform its post-termination obligations, including to abide by the covenant not to compete, under the Franchise Agreements, 7-Eleven is likely to continue suffering substantial injury to its business and reputation, resulting in loss revenues and profits, diminished goodwill, for which 7-Eleven has no adequate remedy at law.

88.     The public interest favors an injunction under such circumstances.

**WHEREFORE**, 7-Eleven demands judgment against the Franchisees granting 7-Eleven:

A.     An Order preliminarily and permanently enjoining the Franchisees, their agents, servants and employees, and those people in active concert or participation with them:

1.     from "maintain[ing], operat[ing], engag[ing] in, or hav[ing] any financial or beneficial interest in, advis[ing], assist[ing], mak[ing] loans to, or leas[ing] to, a Competitive Business" located at the Leased Premises or at the site of any former 7-Eleven store within two years of it being operated as a 7-Eleven store for one year after termination;

2.     from utilizing any of 7-Eleven's Trademarks; and

3.     from utilizing any of 7-Eleven's confidential information.

B.      An order of specific performance requiring the Franchisees to surrender the Leased Premises, the 7-Eleven Equipment, and 7-Eleven's confidential information;

C.      An award to 7-Eleven of its attorney's fees and costs pursuant to the Fla. Stat. § 542.335; and

D.      Such other and further relief as the Court deems just and appropriate.

## COUNT IV- BREACH OF THE FRANCHISE AGREEMENT
(Against the Individual Franchisee only)

89.     7-Eleven realleges and reincorporates by reference paragraphs  1 through 57, 59, and 61 above as if fully set forth herein.

90.     The Individual Franchise Agreement existed between 7-Eleven and the Individual Franchisee.

91.     In the Individual Franchise Agreement, the Individual Franchisee agreed to:

a.      Cause all sales of inventory to be properly recorded at the time of sale;

b.      Prepare and furnish to 7-Eleven daily reports of Purchases;

c.      Keep 7-Eleven advised in writing of all discounts, allowances and/or premiums received in connection with the operation of the store;

d.      Provide 7-Eleven with truthful, accurate and complete information in compliance with all applicable laws and such policies that 7-Eleven implemented from time to time;

e.      Pay all sales, payroll and income taxes with regard to the operation of the store;

f.      Only take draws when financially appropriate in accordance with the procedures contained in the Franchise Agreement;

g.      maintain a high ethical standard in the conduct of the franchised business and in the operation of the Stores;

h.      Not commit any act which may adversely affect or be detrimental to 7-Eleven, other 7-Eleven franchisees, the 7-Eleven Image or the 7-Eleven System (as defined in the Franchise Agreement); and

       i.      Devote its best efforts to the business of the Stores and maximization of the Store's sales and gross profit, and cause the stores to be operated only pursuant to the 7-Eleven System and in a manner that will enhance the 7-Eleven Image.

92.      The Franchisee materially breached each and everyone of its above obligations under the Individual Franchise Agreement.

93.      As a direct, proximate result of those breaches, 7-Eleven suffered damages.

**WHEREFORE**, 7-Eleven demands judgment against the Individual Franchisee for 7-Eleven's damages, interest (pre-judgment and post-judgment), the costs of bringing this action, and such other and further relief as may be just and appropriate.

## <u>COUNT V- BREACH OF THE FRANCHISE AGREEMENT</u>
(Against the Corporate Franchisee only)

94.      7-Eleven realleges and reincorporates by reference paragraphs 1 through 57, 59, and 61 above as if fully set forth herein.

95.      The Corporate Franchise Agreement existed between 7-Eleven and the Corporate Franchisee.

96.      In the Corporate Franchise Agreement, the Corporate Franchisee agreed to:

      a.      Cause all sales of inventory to be properly recorded at the time of sale;

      b.      Prepare and furnish to 7-Eleven daily reports of Purchases;

      c.      Keep 7-Eleven advised in writing of all discounts, allowances and/or premiums received in connection with the operation of the store;

      d.      Provide 7-Eleven with truthful, accurate and complete information in compliance with all applicable laws and such policies that 7-Eleven implemented from time to time;

      e.      Pay all sales, payroll and income taxes with regard to the operation of the store;

      f.      Only take draws when financially appropriate in accordance with the procedures contained in the Franchise Agreement;

g.   maintain a high ethical standard in the conduct of the franchised business and in the operation of the Stores;

h.   Not commit any act which may adversely affect or be detrimental to 7-Eleven, other 7-Eleven franchisees, the 7-Eleven Image or the 7-Eleven System (as defined in the Franchise Agreement); and

i.   Devote its best efforts to the business of the Stores and maximization of the Store's sales and gross profit, and cause the stores to be operated only pursuant to the 7-Eleven System and in a manner that will enhance the 7-Eleven Image.

97.   The Corporate Franchisee materially breached each and everyone of its above obligations under the Corporate Franchise Agreement.

98.   As a direct, proximate result of those breaches, 7-Eleven suffered damages.

**WHEREFORE**, 7-Eleven demands judgment against the Corporate Franchisee for 7-Eleven's damages, interest (pre-judgment and post-judgment), the costs of bringing this action, and such other and further relief as may be just and appropriate.

## COUNT VI- BREACH OF THE GUARANTY
(Against the Individual Franchisee as Guarantor)

99.   7-Eleven realleges and reincorporates by reference paragraphs 1 through 61 above as if fully set forth herein.

100.   A guaranty exists between 7-Eleven and the Individual Franchisee.

101.   Under the Guaranty, the Individual Franchisee unconditionally and absolutely guaranteed the prompt and full payment of liabilities of the Corporate Franchisee under the Corporate Franchise Agreement and the performance of all obligations by the Corporate Franchisee under the Corporate Franchise Agreement.

102.   The Corporate Franchisee breached the Corporate Franchise Agreement, and the Individual Franchisee failed to ensure that the Corporate Franchisee fully performed its obligations under the Corporate Franchise Agreement.

103.     As a direct, proximate result of those breaches, 7-Eleven suffered damages.

**WHEREFORE**, 7-Eleven demands judgment against the Individual Franchisee for its damages, interest (pre-judgment and post-judgment), the costs of bringing this action, and such other and further relief as may be just and appropriate.

<u>**COUNT VII- COMMON LAW FRAUD**</u>

104.     7-Eleven realleges and reincorporates by reference paragraphs 1 through 57, 59, and 61 above as if fully set forth herein.

105.     In wrongly and fraudulently causing false financial reporting of the sales and purchases at the Leased Premises, the Franchisees misrepresented and/or omitted to state and disclose material facts concerning the receipt, use, disposition and diversion of funds received from sales at the stores, concerning the purchase of and payments for inventory at the Leased Premises.

106.     Because of their contractual and other relationships with 7-Eleven, the Franchisees had a duty to truthfully and fully report the sales activities and adjustments at the Leased Premises.

107.     The material misstatements, misrepresentations of material facts, and/or omissions of material facts were known by the Franchisees to have been false when made, and were made by the Franchisees deliberately and with an intent to deceive and to understate, and to deprive 7-Eleven of the amount of monies due 7-Eleven on account of, the 7-Eleven Charge, and to enable Franchisees to siphon cash from the Store's operations for the sole use and benefit of the Franchisees.

108.    The falsity of such information was unknown to 7-Eleven, and 7-Eleven rightfully relied on the completeness and legitimacy of all statements and representations, submissions, receipts and claims made by the Franchisees.

109.    The foregoing actions and practices of the Franchisees were willful, fraudulent, and intentional.

110.    The Franchisees knew and intended that 7-Eleven would rely to its detriment upon the Franchisees' misrepresentations and omissions.

111.    7-Eleven reasonably relied to its detriment upon the Franchisees' misrepresentations and omissions.

112.    By virtue of the fraudulent acts and schemes described in this Complaint, the Franchisees are liable to 7-Eleven for the damages that 7-Eleven suffered as a result of the the Franchisees' actions and schemes, plus punitive damages in an amount to be determined at trial.

**WHEREFORE**, 7-Eleven demands judgment against the Franchisees for damages, including punitive damages, interest (pre-judgment and post-judgment), the costs of bringing this action, and such other and further relief as may be just and appropriate.

**COUNT VIII-DECLARATORY JUDGMENT**
(against the Franchisees)

113.    7-Eleven realleges and reincorporates by reference paragraphs 1 through 57, 59, and 61 above as if fully set forth herein.

114.    By virtue of the conduct of the Franchisees hereinabove described, on June 20, 2013, 7-Eleven issued and delivered to the Franchisees two, separate Non-Curable Notices of Material Breach and Termination of the Agreement.  7-Eleven contends that the Notices may not be cured by the Franchisees, because the serious, willful, material breaches of trust, good faith and fair dealing (as well as of the terms of the respective Franchise Agreements) that

Franchisees' activities described in the Notice of Termination entail, which violate the very core of the contractual relationship between the Franchisees and 7-Eleven.

115.     By their conduct and continued operation of the Leased Premises, it appears that the Franchisees contend that the Notices were improper and of no force and effect.

116.     An actual, existing and justiciable controversy has arisen and exists between 7-Eleven, on the one hand, and the Franchisees, on the other, as to whether 7-Eleven validly and effectively terminated the Franchise Agreements and, if so, whether the termination of such Franchise Agreements may be deemed effective without the Franchisee having an ability to cure their breaches.

117.     7-Eleven has no adequate remedy at law.

**WHEREFORE**, 7-Eleven requests a declaratory judgment form this Court against the Franchisees that 7-Eleven validly and effectively terminated the Franchise Agreements and that the Franchisees did not have the ability to cure the breaches of the Franchise Agreements, the costs of bringing this action, and such other and further relief as may be just and appropriate.

## COUNT IX-EVICTION
(Against the Franchisees)

118.     7-Eleven realleges and reincorporates by reference paragraphs 1 through 57, 59, and 61 above as if fully set forth herein.

119.     As a part of the Franchise Agreements, 7-Eleven leased the Leased Premises to the Franchisee.  By the terms of the written lease contained in Exhibit A of both of the Franchise Agreements (which are attached as Exhibits "A" and "B" to this Complaint), the Franchisees were granted possession of the Leased Premises for ten years unless the Franchise Agreements were terminated sooner.

120.     7-Eleven terminated the Franchise Agreement on June 30, 2013.

121.    The Franchisees no longer has a right to possess the Leased Premises.

122.    On June 20, 2013, 7-Eleven delivered notices that the Franchisees were to deliver possession of the Leased Premises.

123.    The Franchisee failed to surrender possession of the Leased Premises.

**WHEREFORE**, 7-Eleven demands judgment against the Franchisees awarding possession of the Leased Premises to 7-Eleven, the costs of bringing this action, and such other and further relief as may be just and appropriate.

### COUNT X-REPLEVIN
(against the Franchisees)

124.    7-Eleven realleges and reincorporates by reference paragraphs 1 through 57, 59, and 61 above as if fully set forth herein.

125.    Pursuant to the Franchise Agreements, 7-Eleven leased the Franchisees certain equipment located at the Leased Premises, including soda machines, slurpee machines, coolers, cash registers, and other equipment necessary to operate convenience store.  7-Eleven owns the equipment located at the Leased Premises.

126.    Upon termination of the Franchise Agreements, the Franchisees have no right to continue use or possess such equipment.

127.    Pursuant to the Security Agreements, which were entered into as part of the Franchise Agreements and attached to this Complaint as part of Exhibits "A" and "B" the Franchisees granted 7-Eleven a security interest in and a lien on all Goods, including Equipment, Fixtures, and Inventory, and all proceeds thereof held or maintained at the Leased Premises or used in the ownership and operation of the Leased Premises.

128.    To the best of 7-Eleven's knowledge, information, and belief at this point in time, the Equipment at the Leased Premises, along with the Goods, including the Equipment, Fixtures, and Inventory that 7-Eleven has an interest in is valued at not less than $225,000.00.

129.    To the best of 7-Eleven's knowledge, information, and belief, all of the above described property is located at the Leased Premises.

130.    The property described above is wrongfully detained by the Franchisees.

131.    The property described above has not been taken for any tax, assessment, or fine pursuant to law.

132.    The property described above has not been taken under an execution or attachment against 7-Eleven's property.

**WHEREFORE**, 7-Eleven demands judgment against the Franchisees for possession of the personal property described above, the costs of bringing this action, and such other and further relief as may be just and appropriate.

## COUNT XI-COLLECTION OF PROMISSORY NOTE
(against the Franchisees)

133.    7-Eleven realleges and reincorporates by reference paragraphs 1 through 61 above as if fully set forth herein.

134.    In connection with the purchase of the Corporate Store, the Franchisees entered into the Note payable to 7-Eleven in the original principal amount of $79,950.00 in partial payment of the franchise fee for the Corporate Store.

135.    By the terms of the Note, the full amount of the Note is due and payable in full if the Corporate Franchise Agreement becomes terminated without demand or presentment.

136.    The Corporate Franchise Agreement has been terminated.

137.    The Franchisees have failed to pay the amounts now due under the Note.

138.    The Franchisees owe 7-Eleven at least $70,507.39 under the Note.

**WHEREFORE**, 7-Eleven demands judgment against the Franchisees for the principal amount due under the Note, interest (pre and post-judgment), the costs of bringing this action, attorney's fees, and such other and further relief as may be just and appropriate.

Respectfully Submitted,

s/Christian C. Burden
Christian C. Burden
Florida Bar No. 0065129
christian.burden@quarles.com
John M. Guard
Florida Bar No. 374600
john.guard@quarles.com
**QUARLES & BRADY LLP**
101 East Kennedy Boulevard, Suite 3400
Tampa, Florida 33602
813/387-0300
Attorneys for Plaintiff